UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____
DATE FILED: 11/23/2026

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MUDDY BITES, INC.,

Plaintiff,

-against-

24-cv-7089 (LAK-SLC)

EVERGREEN USA LLC, *et ano.*,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING MOTION TO COMPEL**

Appearances:

Michael Croghan
Micah E. Marcus
McDONALD HOPKINS, LLC

David M. Lamb
GISH PLLC

*Attorneys for Plaintiff*

David S. Gold
William W. Stroever
Amanda L. DeGroote
COLE SCHOTZ P.C.

*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

This matter is before the Court on defendants motion pursuant to Federal Rule of Civil Procedure 72(a) to set a side the Magistrate Judge's September 29, 2026 opinion and order, which denied defendants' motion to compel the production of certain privileged documents. For

the reasons that follow, the Magistrate Judge's order is vacated, and the motion to compel is granted to the extent herein set forth.

## ***Facts***

*Background*

Plaintiff Muddy Bites, Inc. sells bite-sized, chocolate-filled waffle cone snacks reminiscent of the last bite of a sundae cone (hereinafter, "Mini Cones").[1] Plaintiff claims to have been the first company to bring Mini Cones to the market in 2019.[2]

But plaintiff is far from the only manufacturer of Mini Cones today. Defendant launched an allegedly "substantially identical" product in October 2021,[3] and by 2024, plaintiff internally was tracking at least four other Mini Cone brands.[4] According to that internal data, plaintiff's share of revenue in the "waffle cone snacks" market (i.e., the Mini Cones market or close to it) fell from an estimated 76 percent in 2022, to 39 percent in 2023, to 20 percent through roughly the first half of 2024.[5]

---

1. *Muddy Bites, Inc. v. Evergreen USA LLC*, No. 24-cv-7089, 2025 WL 2662959, at *1 (S.D.N.Y. Sept. 17, 2025); *see also Muddy Bites, Inc. v. Evergreen USA LLC*, No. 24-cv-7089, 2025 WL 1079494 (S.D.N.Y. Apr. 9, 2025).

2. Second Am. Compl. (Dkt 100-3) ¶ ¶ 31.

3. *Id.* ¶¶ 5, 38.

4. Dkt 155 at 4, 6.

5. *Id.* at 5.

In October 2021, shortly after defendant's product hit the market, plaintiff sent defendant a cease-and-desist letter alleging trademark and copyright infringement.[6] Defendant denied any wrongdoing and alleged that "even a cursory Internet search reveal[ed] multiple companies selling similar products in the United States marketplace, for example Ozmo Cornet, Cono, Pure Temptation Choco Blast, and Häagen-Dazs."[7] Plaintiff reiterated its demands in a follow-up letter dated November 24, 2021, but apparently took no further action for nearly three years.[8]

*PTO Applications Concerning the Mini Cone Product Design*

In June 2021, plaintiff filed an application with the United States Patent and Trademark Office ("PTO") to register as a trademark the design of the Mini Cone (the "First Trade Dress Application").[9] That is, plaintiff asserted trademark rights in the shape and appearance of a bite-sized, chocolate-filled waffle cone.

In March 2022, the PTO issued a non-final office action refusing to register the purported trademark on the ground that "the applied-for mark consist[ed] of a nondistinctive product design or nondisinctive features of a product design that is not registrable on the Principal

---

6 Dkt 153-1.

7 Dkt 153-2.

8 Dkt 122 at 17 ¶¶ 15-16.

9 Dkt 153-1 at 13.

Register without sufficient proof of acquired distinctiveness."[10] The response explained that "[a] product design can never be inherently distinctive as a matter of law" because "consumer predisposition to equate a product design with its source does not exist."[11] Plaintiff was given the opportunity to "respond by providing evidence of acquired distinctiveness, such as verified statements of long term use, advertising and sales expenditures, examples of advertising, affidavits and declarations of consumers, [or] consumer surveys."[12]

Instead of submitting evidence of acquired distinctiveness, plaintiff amended its application to seek registration on the Supplemental Register, which provides less protection than registration on the Principal Register,[13] and the mark was so registered on May 16, 2023.[14]

On June 3, 2023, plaintiff submitted another application seeking to have its product design registered on the Principal Register (the "Second Trade Dress Application").[15] The same day, a Muddy Bites principal, Michael Parisi, noted in an email to an executive at Impact Capital Partners that registration on the Supplemental Register "does not come with a presumption that our

---

10 Dkt 153-3 at 3.

11 *Id.* (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212-13 (2000); *In re Slokevage*, 441 F.3d 957, 962 (Fed. Cir. 2006)).

12 *Id.*

13 *See, e.g.*, *George & Co. v. Spin Master Crop.*, Nos. 19-cv-4391, 19-cv-4883, 2020 WL 3865098, at *5 n.6 (E.D.N.Y. July 7, 2020).

14 Dkt 153-4.

15 Dkt 153-5.

mark is a valid trademark."[16] But Mr. Parisi explained that trademark counsel believed the company would be in a good position to assert "acquired distinctiveness" after "5 years of continuous use," likely leading to registration on the Principal Register, which would give the company "incredible leverage . . . to help prevent confusingly similar uses of our mark in relation to identical and related goods" and require competitors "to change their identity completely."[17]

On November 8, 2023, the PTO issued a non-final office action again denying the registration on the ground that the product design was non-distinctive and again inviting plaintiff to submit evidence of acquired distinctiveness.[18] On December 11, 2023, BraunHagey & Borden LLP replaced Holland & Hart LLP as plaintiff's counsel of record before the PTO.[19]

On May 8, 2024, plaintiff submitted a response to the non-final action in which plaintiff asserted that its product design had "acquired distinctiveness through [plaintiff's] five years of continuous and substantially exclusive use."[20]

For context, Section 2(f) of the Lanham Act establishes the process by which a non-inherently distinctive mark may obtain registration on the Principal Register on the ground that it has "acquired distinctiveness."[21] As relevant here, that section provides that the PTO "may accept

---

16 Dkt 155-2.

17 *Id.*

18 Dkt 153-6.

19 Dkt 153-7.

20 Dkt 153-8 at 5.

21 15 U.S.C. § 1052(f).

as prima facie evidence that the mark has become distinctive . . . proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made."[22]

In support of its May 8, 2024 response to the PTO, plaintiff submitted a declaration by its head of marketing, Jessie Ferraioli (the "Ferraioli Declaration"). Ms. Ferraioli asserted that plaintiff's product design had "become distinctive for the Muddy Bites snacks through its substantially exclusive and continuous use in commerce for at least five years immediately before the date of this statement."[23] In addition, Ms. Ferraioli referenced, and provided examples of, plaintiff's "marketing and advertising efforts, strategic relationships including sponsorships and endorsements, sales, and press coverage."[24]

Following submission of plaintiff's purported proof of acquired distinctiveness, the Second Trade Dress Application was granted, and the trademark was registered on the Principal Register on September 3, 2024.[25] Fifteen days later, plaintiff filed this lawsuit.

*Defendants' Motion to Compel*

Defendants moved to compel the production of numerous documents withheld on the basis of attorney-client and work-product privilege, arguing that the record provided probable

---

22 *Id.*

23 *Id.* at 10.

24 *Id.* at 9.

25 Dkt 153-9.

cause to believe that plaintiff had committed a fraud on the PTO during the prosecution of the Second Trade Dress Application.[26] Specifically, defendants argued that Ms. Ferraioli's sworn claim of "substantially exclusive" use was demonstrably false in light of the fact that defendant and other competitors, by the time the statement was made, had captured an equal or greater share of the Mini Cone market.

Plaintiff opposed the motion, principally arguing that a trademark applicant "has no obligation [] to disclose known users believed to be infringing the applicant's rights in the mark" and that plaintiff has "always considered Defendant's and others' copycat products as infringing."[27] Plaintiff argued also that defendants had failed to prove that any of the hundreds of privileged communications at issue were in furtherance of any crime of fraud, even assuming such a crime or fraud existed.

The Court referred the matter to the Magistrate Judge, who denied the motion. The Magistrate Judge agreed with plaintiff that the phrase "substantially exclusive" "makes allowance for use by others which may be inconsequential or infringing," and noted that plaintiff consistently had maintained that the alleged copycat products, including defendant's, were infringing.[28] The Magistrate Judge concluded that the record "support[ed] the inference that Muddy Bites had a good faith belief in the truth of the statements in the Declaration."[29]

---

[26] Dkt 112.

[27] Dkt 118 at 3 (quoting *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1353 (E.D.N.Y. 1994)).

[28] Dkt 147 at 5-6 (quoting *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999)).

[29] *Id.* at 6.

Defendants filed a timely objection under Rule 72(a).

## ***Discussion***

The parties agree that a party seeking to overcome a claim of attorney-client privilege "must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime."[30] The record must strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof."[31] The parties agree also that fraud in procuring a trademark occurs when a party "*knowingly* makes a false, material representation with the intent to deceive the PTO."[32] Finally, the parties agree that, upon timely objection under Rule 72(a), this Court may set aside any part of the Magistrate Judge's order "that is clearly erroneous or is contrary to law."[33]

The present dispute revolves around whether there is reasonable basis to suspect that Ms. Ferraioli's assertion of "substantially exclusive" use was knowingly false, material, and made with an intent to deceive the PTO. The record establishes that, by May 2024, when that statement was made, numerous competitors had begun selling virtually identical Mini Cones and, in fact,

---

30 *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).

31 *Id.*

32 *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (emphasis in origional) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009)).

33 Fed. R. Civ. P. 72(a).

collectively had acquired a majority share of the market for that product, with defendant alone equaling or exceeding plaintiff's sales.[34] Thus, there really is no question that plaintiff's claim of "substantially exclusive" use of the product design during the relevant time frame was demonstrably false if its truthfulness were measured solely against the plain meaning of the words "substantial" and "exclusive."[35]

Plaintiff argues, however, and the Magistrate Judge appeared to agree, that the assertion of substantially exclusive use could not knowingly have been fraudulent because of caselaw that suggests that "infringing" uses may be disregarded entirely. Although these authorities admittedly muddy the waters to some extent, they ultimately cannot bear the weight that plaintiff assigns them. And in any event, there is reasonable ground to doubt that plaintiff truly held a good faith belief that defendant's use of the product design (as opposed to other aspects of defendant's trade dress) was infringing at the time the declaration was submitted.

To start, plaintiff relies heavily on inapposite caselaw concerning certifications under Section 1(a) of the Lanham Act. Under Section 1(a), all applicants for trademark registration must swear that "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce . . . as to be likely . . . to cause confusion, or to cause mistake, or to

---

34 Dkt 155 at 5. Although the internal market data cited by defendants was produced after Ms. Ferraioli submitted her declaration, it is reasonable to presume that plaintiff had been tracking the market in a similar manner prior to May 8, 2024. Plaintiff certainly has not contested that defendant had acquired an equal or greater share of the Mini Cone market by May 2024 and that such information was known to the plaintiff.

35 Furthermore, given that Section 2(f) permits the PTO to treat a sworn statement of substantially exclusive use as prima facie evidence of acquired distinctiveness, and in consideration of the other evidence included in the submission, there is at least probable cause to suspect that the statement of substantial exclusivity was material and relied upon by the PTO when it registered the mark.

deceive."[36] Courts have rejected the notion that an applicant commits fraud by making *that* statement despite knowing of junior and/or infringing uses of the same trademark.[37] Defendants have not alleged fraud in plaintiff's affirmation under Section 1(a).

Relying on the same line of cases,[38] plaintiff invokes the proposition that an applicant has "no obligation . . . to disclose known users believed to be infringing the applicants rights in the mark."[39] To the extent that principle is even applicable outside the Section 1(a) context,[40] it is irrelevant here, as defendants do not argue that plaintiff committed fraud by failing to disclose third-party uses of the mark. Rather, defendants allege that plaintiff made an *affirmative* misstatement by claiming "substantially exclusive" use.[41]

In *Marshall Field & Co v. Mrs. Fields Cookies*,[42] the Trademark Trial and Appellate Board distinguished between Section 1(a) and Section 2(f) certifications to reject the argument that there could "be no fraud as a matter of law" in a challenged Section 2(f) statement because "there

---

36 15 U.S.C. § 1051(a)(3)(D); 37 C.F.R. § 2.33(b)(1).

37 *See Dial-A-Mattress*, 841 F. Supp. at 1353; *Zip Dee, Inc. v. Dometic Corp.*, 900 F. Supp. 1004, 1015 (N.D. Ill. 1995).

38 *See also Lego A/S v. Zuru Inc.*, 827 F. Supp. 3d 313 (D. Conn. 2026).

39 *Dial-A-Mattress*, 841 F. Supp. at 1353.

40 Although *Lego A/S v. Zuru Inc.*, 827 F. Supp. 3d 313 (D. Conn. 2026), applied *Dial-A-Mattress* in the context of an alleged fraud under Section 2(f), it did not acknowledge that *Dial-A-Mattress* concerned an alleged fraud under Section 1(a).

41 *See Marshall Field & Co. v. Mrs. Fields Cookies*, 11 U.S.P.Q.2d 1355, 1989 WL 297871, at *3 (T.T.A.B. 1989) (explaining that while generally there is "no duty to specify the names of third party users," a claim of substantially exclusive use "must be truthful").

42 11 U.S.P.Q.2d 1355, 1989 WL 297871 (T.T.A.B. 1989).

is no duty to disclose the existence of junior third party users of a mark."[43] The Board explained that the two certifications have "differing purposes."[44] A Section 1(a) affidavit serves to "establish a colorable claim of title to a geographically unrestricted registration," and "the existence of junior users . . . would not normally serve as a basis for the denial by the examiner of a party's request for a geographically unrestricted registration."[45] In contrast, the purpose of a Section 2(f) affidavit "is to persuade the Examiner that a mark otherwise not entitled to a Principal Register registration has acquired sufficient distinctiveness through widespread use by the applicant in commerce such that the mark now designates only one source of origin."[46] In that context, "the existence of numerous third-party users of a mark, *even if junior*, might well have a material impact on the Examiner's decision to accept a party's claim of distinctiveness."[47]

It is true that courts have held that the statutory term "substantially" "makes allowance for use by others which *may be* inconsequential or infringing and which therefore does not *necessarily* invalidate the applicant's claim."[48] But "simply because use by others *may not*

---

43 *Id.* at *3.

44 *Id.*

45 *Id.*

46 *Id.*

47 *Id.* (emphases added).

48 *L.D. Kichler*, 192 F.3d at 1352 (emphasis added) (quoting Trademark Manual of Examining Procedure § 1212.05(b)); *see also Victorinox AG v. B&F Sys.*, 709 F. App'x 44, 48 (2d Cir. 2017) ("[O]ther companies' use of the mark *alone* does not establish that Plaintiffs' use was not 'substantially exclusive.'" (emphasis added)).

*necessarily* invalidate a claim of distinctiveness does not mean that it *absolutely cannot*."[49] It is well established that, as noted above, the existence of third-party uses of the same mark, "even if junior," may preclude a finding of substantial exclusivity.[50] In other words, each case turns on its facts.[51] The cases cited by plaintiff do not undermine the common-sense proposition that in some cases the extent and character of third-party uses of a mark may be "so substantial" that a court can conclude a claim of substantial exclusivity must have been knowingly false when made.[52]

---

49 *Pearson Facial Plastic Surgery, P.A. v. J.M. Pearson, M.D., Inc.*, No. 13-cv-03440, 2013 WL 12149231, at *3 (C.D. Cal. Sept. 10, 2013).

50 *Marshall Field*, 1989 WL 297871, at *3; *see also Galperti, Inc. v. Galperti S.r.l.*, 17 F.4th 1144, 1149 (Fed. Cir. 2021) ("Use by anyone, regardless of relation to the challenger, may undercut a claim of substantially exclusive use."); *Target Brands, Inc. v. Hughes*, 85 USPQ2d 1676, 2007 WL 4287253, at *7 (T.T.A.B. 2007) ("Applicant may have used ULTIMATE POLO for several years prior to Target's adoption of the same designation as a descriptive term. However, Target's sales and advertising expenditures related to its 'ultimate polo' shirts have been very substantial, and while there is no exact evidence bearing on the extent of additional use of 'ultimate polo' by third parties, such users are too numerous to ignore."); *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 U.S.P.Q.2d 1392, 2016 WL 4474509, at *13 (T.T.A.B. 2016) ("While absolute exclusivity is not required, the widespread use of the surname Ayoub by unaffiliated rug, carpet and flooring businesses is inconsistent with Applicant's claim of acquired distinctiveness of AYOUB." (citation omitted) (citing *L.D. Kichler*)); *Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 1299 (C.C.P.A. 1972) ("This evidence of a significant and continuous concurrent use of the term by appellee rebuts appellant's contention that it has exclusively and continuously used the mark with the result that it has become distinctive of its goods.").

51 In *L.D. Kichler*, for example, the appeals court reversed the trial court's holding that *any* use of a mark by a third party precludes a substantially exclusive affirmation and held that a genuine dispute of material fact existed for trial. 192 F.3d at 1352. It had no occasion to consider, on a full record, whether any purportedly "infringing" uses precluded defendant's claim of fraud on the PTO.

52 *Marshall Field*, 1989 WL 297871, at *4. The Magistrate Judge distinguished *Marshall Field* on the ground that the Board there had "based its finding that the 'Chairman's statement of "substantially exclusive and continuous use" was knowingly false, unsupported, and without adequate investigation or inquiry' on the Chairman's own admission that before he made the statement, neither he nor any other employee 'examine[d] company records to determine whether others were using the name FIELD's[.]" Dkt 147 at 6 (quoting *Marshall Field*, 1989 WL 297871, at *2). Respectfully, this misreads that decision twice over. First, the

Here, there is a reasonable basis to suspect that plaintiff's claim of substantial exclusivity was knowingly false. First, as noted above, defendant's and other competitors had captured *a majority* of the market by 2023, and were only continuing to expand their market share during the first half of 2024, meaning plaintiff was nowhere close to an exclusive seller of Mini Cones during the relevant period.[53] Regardless of whether defendant's use of the design had been infringing to some extent,[54] the presence and success of so many other sellers in that nascent market decisively cuts against any claim that plaintiff's design had acquired distinctiveness through five years of exclusive use.[55]

---

quoted "finding" of the Board was in fact just a recitation by the Board of the allegations of a counterclaim The Board held later in the opinion that the counterclaim "state[d] a claim upon which relief could be granted," *id.* at *4, but it made no findings on the merits. Second, the Board treated the allegation concerning the chairman's failure to investigate as "an *alternative* basis for the claim of fraud." *Id.* at *4 n.1 (emphasis added). The presence of that alternative theory did not affect the Board's separate holding that the chairman may have committed fraud by asserting substantially exclusive use despite knowing about widespread use of similar marks by others.

Plaintiff, meanwhile, points out that the Board ultimately rejected the counterclaim on the merits. *See Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q.2d 1321, 1992 WL 421449 (T.T.A.B. 1992). But it did so because, in addition to claiming substantial exclusivity, the applicant made a "forthright disclosure of known third-party users . . . in its application" and stated that the applicant believed those users "to be local and without superior rights to its own." *Id.* at *9. Plaintiff here did not qualify its claim of substantially exclusivity by disclosing known third-party uses and explaining that it believed those uses to be infringing.

53 Dkt 155 at 5-6.

54 Notably, this is not a case where the allegedly infringing users were selling counterfeit products under the Muddy Bites name rather than under their own brands. *See, e.g.*, Second Am. Compl. (Dkt 100-3) ¶ 40 (comparing plaintiff's and defendant's packaging).

55 *See, e.g.*, *In re General mills IP holdings II, LLC*, 124 U.S.P.Q.2d 1016, 2017 WL 4082590, at *6 (T.T.A.B. 2017) ("[N]on-exclusive use presents a serious problem for the merchant seeking to develop trademark rights in a word, symbol, or device that is not inherently distinctive, because it interferes with public perception that it serves as an indicator of single source.").

Second, the record demonstrates that plaintiff had a strong incentive, and was eager, to obtain registration on the Principal Register in order to go after competitors.[56]

Third, plaintiff's claim of infringement by the defendant depends on plaintiff's design having acquired distinctiveness by 2021.[57] Yet the Ferraioli Declaration claimed that plaintiff's design had become distinctive through its five years of use between 2019 and 2024 – not through advertising and sales successes between 2019 and 2021.[58] Furthermore, after the PTO invited plaintiff to submit proof of acquired distinctiveness in March 2022, plaintiff declined to submit such evidence and instead sought publication on the Supplemental Register – even though, again, on plaintiff's theory of infringement against defendant, its design already had acquired distinctiveness by that time.

The above evidence may not ultimately suffice to prove a claim of fraud on the PTO, but it constitutes at least probable cause to suspect a knowing fraud.[59] The mere fact that it is possible Ms. Ferraioli subjectively believed her statement to be true does not change the fact that

---

56 Dkt 155-2.

57 *See, e.g.*, *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980) ("Even if Saratoga Vichy has rights in the name 'Saratoga' because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired.").

58 Dkt 153-8 at 10.

59 The question whether to engage in *in camera* review is committed to the discretion of the district court. *Jacobs*, 117 F.3d at 87. In the circumstances, and in light of the evidentiary showing that has been made, the Court concludes that such a review is unnecessary and would needlessly delay the litigation of this matter which already has been pending for more than two years.

there is reasonable ground to suspect that she knew that it was false.[60] The Magistrate Judge's contrary conclusion was clearly erroneous.[61]

There is probable cause to suspect also that at least some of the attorney-client communications sought by defendants were made in furtherance of this possible fraud. Plaintiff submitted the contested declaration and other supplemental application materials through counsel. To the extent that plaintiff devised a scheme to defraud the PTO, communications with trademark counsel concerning submission of the application consummating that fraud necessarily were in furtherance of that scheme (or at least there is a reasonable basis to suspect that they were).

The Court agrees with plaintiff, however, that not all of the documents should be disclosed on the present record. The plaintiff received notice of the non-final office action on the Second Trade Dress Application on November 8, 2023, and submitted its response on May 8, 2024. The Court thus will limit those documents submit to disclosure to those dated within that period. Furthermore, the present privilege log does not provide an adequate basis to determine whether communications, even within that limited time frame, concerned the Second Trade Dress Application or other trademark matters. The Court thus will accept defendants' invitation to require disclosure of only those documents with a nexus to the Second Trade Dress Application.

---

60 *Chevron Crop. v. Donziger*, No. 11-cv-691, 2013 WL 1087236, at *25 (S.D.N.Y. Mar. 15, 2013) (explaining that a finding of probable cause is not negated by "an innocent explanation which may be consistent with the facts alleged" (quoting *United States v. McDonald*, 01-cr-1168, 2002 WL 31956106, at *5 (E.D.N.Y. May 8, 2002)).

61 *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

### *Conclusion*

For the foregoing reasons, defendants' motion to set aside the Magistrate Judge's opinion and order (Dkt 153) is granted, and Docket 147 is vacated. Defendants' motion to compel (Dkt 112) is granted to the extent that: No later than December 7, 2026, plaintiff shall produce to defendants all documents in Exhibit 15 to Docket 153 (Dkt 153-10) that (1) are dated between November 8, 2023 and May 8, 2024, inclusive; (2) include Ms. Ferraioli as a recipient or sender; and (3) concern or relate to the Second Trade Dress Application as defined above, including the November 8, 2023 notice of non-final action and plaintiff's May 8, 2024 filing with the PTO. The motion to compel otherwise is denied.

SO ORDERED.

Dated: November 23, 2026

Lewis A. Kaplan
United States District Judge